**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

B.H.,

        Defendant.

No. 04-CV-2051-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

II.   PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . *2*

III.  LEGAL STANDARD FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . *2*

IV.  UNDISPUTED MATERIAL FACTS  . . . . . . . . . . . . . . . . . . . . . . *3*
    A.    Involuntary Hospitalization Proceedings . . . . . . . . . . . . . . . . . *3*
    B.    Seizure of Firearms and Ammunition  . . . . . . . . . . . . . . . . . . *6*

V.   ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*
    A.    Is Defendant a Prohibited Person? . . . . . . . . . . . . . . . . . . . *8*
        1.    Was B.H. "adjudicated as a mental defective"? . . . . . . . . . *8*
        2.    Was B.H. "committed to a mental institution"? . . . . . . . . *12*
        3.    Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . *16*
    B.    Third-Party Sale . . . . . . . . . . . . . . . . . . . . . . . . . . *16*

VI.  MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . . . . . . . *17*

VII. CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *18*

## I. INTRODUCTION

Before the court is the government's Motion for Summary Judgment ("Motion") (docket no. 41).

## II. PROCEDURAL BACKGROUND

Most of the procedural background of this case is set forth in a prior order. *See* Order (docket no. 21).[1] The court need not repeat it here.

On August 2, 2006, the Eighth Circuit Court of Appeals reversed and remanded the instant case for further proceedings. On November 13, 2006, mandate issued.

On November 16, 2006, the court held a status hearing. Assistant United States Attorney Robert L. Teig represented the government. Attorney Michael K. Lahammer represented B.H.[2] At the hearing, the parties agreed to resubmit the Motion on the original briefs for consideration of the merits.

## III. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it is a fact that "might affect the outcome

---

[1] *United States v. B.H.*, 375 F. Supp. 2d 810, 811-12 (N.D. Iowa 2005), *rev'd on other grounds*, 456 F.3d 813 (8th Cir. 2006)

[2] B.H. was not personally present. The court granted B.H.'s request for permission to waive his presence. Attorney Lahammer represented to the court that B.H. "checked himself into the Knoxville, Iowa, Veterans Hospital due to problems with his prescription drugs . . . on his mental status." Request to Waive Presence of Defendant at Hearing (docket no. 38).

of the suit under the governing law." *Anderson,* 477 U.S. at 248. The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see, e.g., Baum v. Helget Gas Prods., Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### IV. UNDISPUTED MATERIAL FACTS

B.H. is a 63-year-old resident of Waterloo, Iowa. He has a long history of mental illness. He also collects firearms and ammunition.

#### A. Involuntary Hospitalization Proceedings

In August of 2002, an applicant[3] commenced involuntary hospitalization proceedings against B.H. in the Iowa District Court in and for Black Hawk County,

---

[3] The record does not indicate who filed the application against B.H.

pursuant to Iowa Code § 229.6.[4] On August 21, 2002, a doctor examined B.H. and prepared a written report of his findings, pursuant to Iowa Code §§ 229.10 and 229.11.[5] The doctor diagnosed B.H. with schizophrenia, found that he was "mentally ill" and concluded that he was likely to physically injure himself or others. The doctor wrote:

> [B.H.'s] brother has convinced [him] that he does not need medication for his mental condition and[,] as a result, [B.H.] has been off his medication for over three months. [B.H.] lacks insight into his mental condition and is unable to make sound judgments in his own behalf.
>
> . . . .
>
> [B.H.] is very hostile toward family and friends. He has a history of homicidal ideations and threats. Currently[, B.H.] has violent thoughts, has several guns in [his] home and stores live ammunition. [He] is currently hearing voices of [the] Viet [Cong].
>
> . . . .
>
> He refuse[s] to see [a] psychiatrist and feels that [I] can read his thoughts.

The doctor recommended that B.H. receive full-time inpatient treatment at a hospital.

---

[4] "[A]ny interested person" may file an application in the Iowa District Court that states a belief that someone is "seriously mentally impaired." Iowa Code § 229.6. The applicant may request that the respondent be taken into custody immediately. *Id.* § 229.11. It appears that the applicant requested that B.H. be immediately taken into custody.

[5] After an application for commitment is filed, a judge of the Iowa District Court must schedule a hospitalization hearing. Iowa Code § 229.7. Prior to the hospitalization hearing, a doctor must examine the respondent, *id.* § 229.10(1), prepare a written report of the examination, *id.* § 229.10(2), and disclose the report to the respondent's attorney, *id.*

4

On August 22, 2002, a judicial hospitalization referee ("referee")[6] reviewed the doctor's report and found that there was probable cause to believe that B.H. was "seriously mentally impaired" and was likely to injure himself or others if allowed to remain at liberty. Pursuant to Iowa Code § 229.11, the referee ordered that B.H. be hospitalized until she could hold a formal hearing on the application ("Hospitalization Hearing") in compliance with Iowa Code § 229.12.[7]

On September 4, 2002, the referee held the Hospitalization Hearing. After the Hospitalization Hearing, the referee found, by clear and convincing evidence, that B.H. was "seriously mentally impaired." The referee ordered B.H. "immediately committed as an out-patient to Black Hawk-Grundy Mental Health Center [("Center")] for a complete evaluation and appropriate treatment." The referee also ordered B.H. to be "medicated by injections prior to discharge from the hospital." The referee stated that, if B.H. failed or refused to submit to such treatment, she might order him to undergo inpatient treatment. The referee ordered the Chief Medical Officer of the Center to report on B.H.'s status by September 19, 2002.

On October 22, 2002, January 31, 2003, and March 24, 2003, the referee reviewed reports from the Chief Medical Officer. On each occasion, the referee ordered that B.H.'s "out-patient commitment previously ordered herein . . . continue for the reason that [he]

---

[6] A judicial hospitalization referee may preside over an involuntary hospitalization in lieu of a judge of the Iowa District Court. Iowa Code § 229.21; *see, e.g., Loughlin v. Cherokee County*, 364 N.W.2d 234, 236 (Iowa 1985) (describing the role of referees in Iowa).

[7] A referee may order that the respondent be taken into immediate custody if he or she finds "probable cause . . . that the respondent has a serious mental impairment and is likely to injure the respondent or other persons if allowed to remain at liberty." Iowa Code § 229.11.

is in need of continued out-patient treatment."

On April 10, 2003, the referee reviewed another report from the Chief Medical Officer. This time, the referee ordered that B.H.'s "out-patient commitment previously ordered herein shall immediately terminate and [B.H.] is hereby discharged."

### B. Seizure of Firearms and Ammunition

On August 23, 2002, a state search warrant was issued in Black Hawk County.[8] The warrant authorized the search of B.H.'s premises and vehicles and the seizure of firearms, other dangerous weapons and ammunition "being held in violation of the laws of this state." On the same date, law enforcement officers executed the warrant and seized twelve handguns, eight long guns, thousands of rounds of ammunition and over 150 pounds of gunpowder. *See* Redacted Inventory (attached).

On November 6, 2003, a state district court judge ordered state law enforcement officials to return the firearms and ammunition to B.H. on or before December 9, 2003. On December 5, 2003, federal agents seized the items from the Black Hawk County Sheriff's Office.

### V. ANALYSIS

In its Complaint, the government asks the court "to declare that [B.H.'s] firearms, ammunition, and related items[, which were] seized during a criminal investigation[,] are contraband as to B.H. and must be destroyed." Complaint at ¶ 1; *see* 28 U.S.C. § 2201 *et seq.* (granting court authority to issue declaratory judgments).[9] At issue is 18 U.S.C.

---

[8] In Iowa, law enforcement officers with a warrant are permitted to seize "[p]roperty which if not seized . . . poses an imminent danger to a person's health, safety, or welfare." Iowa Code § 809.1(1)(c).

[9] In pertinent part, the Declaratory Judgment Act provides:

(continued…)

§ 922(g)(4), which provides:

> (g) It shall be unlawful for any person—
> . . . .
> (4) who has been adjudicated as a mental defective or who has been committed to a mental institution;
> . . . .
> to . . . possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(4). There are two fighting issues: (1) whether B.H. is a prohibited person, that is, whether he was "adjudicated as a mental defective"[10] or "committed to a mental institution" on September 4, 2002, and (2) if so, whether the court may order the government to turn the firearms and ammunition over to a third party for a sale, with B.H. receiving the proceeds. The court considers each issue, in turn.

---

[9](…continued)
> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration . . . . Any such declaration shall have the force and effect of a final judgment or decree . . . .

28 U.S.C. § 2201. "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." *Id.* § 2202.

[10] The term "mental defective" is offensive to the modern ear. Perhaps such was not the case in the early 1900s, but today persons with disabilities should not be described as "defective." However, this court must examine the words used by Congress and apply the law as it is written.

7

## A. Is B.H. a Prohibited Person?

Whether B.H. is a prohibited person is a question of federal law. *See NLRB v. Natural Gas Util. Dist.*, 402 U.S. 600, 603 (1971) ("[I]n the absence of a plain indication to the contrary . . . it is to be assumed when Congress enacts a statute that it does not intend to make its application dependent on state law."); *see, e.g., United States v. Whiton*, 48 F.3d 356, 358 (8th Cir. 1995) ("The issue of whether a person has been committed to a mental institution is a question of federal law."). "[B]ecause it will almost always be the case that a prior commitment will have occurred pursuant to state law, '[the court] may seek guidance from state law' in resolving that federal question." *Whiton*, 48 F.3d at 358 (quoting *United States v. Giardina*, 861 F.2d 1334, 1335 (5th Cir. 1988)). Thus, the court examines Iowa involuntary hospitalization law to determine whether B.H. was "adjudicated as a mental defective" or "committed to a mental institution." *See, e.g., United States v. Dorsch,* 363 F.3d 784, 786-87 (8th Cir. 2004) (examining state law to determine whether a defendant was "committed to a mental institution"); *United States v. Hansel*, 474 F.2d 1120, 1123 (8th Cir. 1973) (examining state law to determine whether a defendant was "adjudicated as a mental defective").

### 1. Was B.H. "adjudicated as a mental defective"?

Congress did not define the term "mental defective." *Hansel*, 474 F.2d at 1123. After considering the term at length, however, the Eighth Circuit Court of Appeals defined "[a] mental defective" as "a person who has never possessed a normal degree of intellectual capacity." *Hansel*, 474 F.2d at 1124. A "mental defective" is to be contrasted with an "insane person." *Id*. An "insane person" is defined as a person who has "faculties which were originally normal [but were] impaired by mental disease." *Id*.

The referee did not find that B.H. was a "mental defective." The referee found that Defendant was "seriously mentally impaired." Under Iowa law, a person is seriously

8

mentally impaired if the person has a mental illness and

> because of that illness lacks sufficient judgment to make responsible decisions with respect to the person's hospitalization or treatment, and who because of that illness meets any of the following criteria:
> a. Is likely to physically injure the person's self or others if allowed to remain at liberty without treatment.[11]
> b. Is likely to inflict serious emotional injury on members of the person's family or others who lack reasonable opportunity to avoid contact with the person with mental illness if the person with mental illness is allowed to remain at liberty without treatment.
> c. Is unable to satisfy the person's needs for nourishment, clothing, essential medical care, or shelter so that it is likely that the person will suffer physical injury, physical debilitation, or death.

Iowa Code § 229.1(16).[12] Critically, the referee's finding that B.H. was "seriously mentally impaired" at the time of the Hospitalization Hearing does not amount to a finding that B.H. "never possessed a normal degree of intellectual capacity." *Hansel*, 474 F.2d at 1124. Indeed, nothing in the record indicates that B.H. has never possessed a normal degree of intellectual capacity. The doctor indicated in his report that B.H. developed schizophrenia in the 1960s and has intermittently battled the disease since that time.

The government contends that *Hansel* was wrongly decided. The government points

---

[11] To find that the respondent is a danger to himself or others, there must be evidence of a recent overt act, attempt or threat. *In re J.P.*, 574 N.W.2d 340, 344 (Iowa 1998).

[12] A finding of serious mental impairment is not a finding of "incompetency." Iowa Code § 229.27(1). "The test of competence . . . is whether the person possesses sufficient mind to understand in a reasonable manner the nature and effect of the act in which the person is engaged . . . ." *Id.* § 229.27(2).

out that, after *Hansel* was decided, the Supreme Court stated, in *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103 (1983), that 18 U.S.C. § 921 *et seq*. has a "broad prophylactic purpose." *Dickerson*, 460 U.S. at 118. The Supreme Court stated that the statute should be interpreted broadly, in order to "'curb crime by keeping firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'" *Id.* at 118-19 (quoting *Huddleston v. United States*, 415 U.S. 814, 824 (1974) (quoting, in turn, S. Rep. No. 1501, 90th Cong., 2nd Sess., 22 (1968))); *see also Barrett v. United States*, 423 U.S. 212, 220-21 (1976) (recognizing same). To the contrary, in *Hansel*, the Eighth Circuit Court of Appeals stated is was interpreting the statute narrowly. In pertinent part, the Eighth Circuit Court of Appeals wrote:

> [W]e are left to ourselves to determine the meaning of the term "mental defective," . . . without any revealing guides as to the intent of Congress. In these circumstances we should follow the familiar rule that criminal statutes are to be strictly construed and give to '[mental defective]' its narrow meaning . . . ." *Yates v. United States*, 354 U.S. 298, 310 (1957).
>
> . . .
>
> We recognize that the term "mental defective" has on occasion, been given a more expansive meaning by courts and legislatures. *See*[] *United States v. Flores-Rodriguez*, 237 F.2d 405, 411 ([2d] Cir. 1956). But as we have said, we must construe the statute narrowly and give to "mental defective" its general meaning. If it is the desire of Congress to prohibit persons who have any history of mental illness from possessing guns, it can pass legislation to that effect, but we cannot read into this criminal statute an intent to do so. We can speculate that Congress desired to keep guns from all who had a history of mental illness and we might agree that such a policy would be desirable; but we can find no support for such a holding on our part.

10

*Hansel*, 474 F.2d at 1123 & 1125.

The government urges the court to adopt a broader definition of "mental defective," which would clearly encompass the referee's findings. For example, the Bureau of Alcohol, Tobacco and Firearms ("ATF") has promulgated a regulation that defines "adjudicated as a mental defective" as "[a] determination by a court . . . that a person, as a result of . . . mental illness . . . condition, or disease: (1) Is a danger to himself or others; or (2) Lacks the mental capacity to contract or manage his own affairs." 27 C.F.R. § 478.11 (2004). The government points out that a federal district court in Michigan explicitly declined to follow *Hansel* and instead adopted the ATF's regulation. *United States v. Vertz*, 102 F. Supp. 2d 787, 788 (W.D. Mich. 2000), *aff'd on other grounds*, 40 Fed. Appx. 69 (6th Cir. 2002).

Unlike the district court in *Vertz*, this court is bound to follow *Hansel*, so long as it is not inconsistent with Supreme Court precedent. The court recognizes that there is some tension between *Hansel* and *Dickerson*,[13] but does find that the two cases are inconsistent. The Supreme Court's reference to the "broad prophylactic purpose" of 18 U.S.C. § 921 was a general remark about the statute; the Supreme Court did not define "mental defective." As the Eighth Circuit Court of Appeals noted in *Hansel*, the phrase "mental defective" is a term of art with a long history in psychology and the law. *See Hansel*, 474 F.2d at 1124 (discussing treatises and cases from the early 1900s). *Dickerson* does not foreclose the possibility that Congress intended that the statute generally be

---

[13] There is also some tension between *Hansel* and *United States v. Dorsch*, 363 F.3d 784 (8th Cir. 2004) insofar as the panel in the latter case expressly adopted the same ATF regulation's definition of "committed to a mental institution." *See Dorsch*, 363 F.3d at 785-87 (analyzing 27 C.F.R. § 478.11). Neither the government nor B.H. discusses *Dorsch*.

11

interpreted broadly, but intends that the term "mental defective" be interpreted narrowly, in light of its historical use in the law. It is a well-settled principle that "where words are employed in a statute which had at the time a well-known meaning . . . in the law of this country, they are presumed to have been used in that sense." *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 59 (1911); *see Neder v. United States*, 527 U.S. 1, 22 (1999) (approving of *Standard Oil*). *Hansel*'s discussion illustrates that "mental defective" is precisely such a term. Nothing in *Dickerson* holds to the contrary.

Accordingly, because the referee did not find that B.H. never possessed a normal degree of intellectual capacity, the court holds that B.H. was not "adjudged as a mental defective" in September of 2002. 18 U.S.C. § 922(g)(4).

### 2. Was B.H. "committed to a mental institution"?

The government contends that, even if B.H. was not "adjudged as a mental defective," he was "committed to a mental institution." B.H. contends that outpatient treatment is not commitment to a mental institution, and thus he was not committed to a mental institution.

"Section 922 does not define the term 'committed to a mental institution.'" *Dorsch*, 363 F.3d at 785. The Eighth Circuit Court of Appeals defines the term as "[a] formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority." *Id.* at 785 (quoting 27 C.F.R. § 478.11).[14] Whether outpatient treatment may constitute commitment to a mental institution is a matter of first impression.

The court holds that outpatient treatment may constitute commitment to a mental institution. The plain language of the statute is controlling. *See Am. Bank. & Trust Co. v. Dallas County*, 463 U.S. 855, 873 (1983) (finding plain language of statute controlling).

---

[14] Neither party discusses this definition. *See supra* note 13.

The statute only requires commitment *to* a mental institution, not commitment *in* a mental institution. 18 U.S.C. § 922(g)(4).

The court also holds that, on the facts of this case, B.H. was "committed to a mental institution." A brief examination of Iowa's involuntary hospitalization law, the referee's orders and the Chief Medical Officer's actions proves this conclusion.

Upon finding that the respondent has a "serious mental impairment," the judicial officer is required to "order the respondent committed as expeditiously as possible for a complete psychiatric evaluation and appropriate treatment . . . ," *id*. § 229.13(1). Appropriate treatment includes "place[ment] under the care of [a] . . . hospital or [other licensed facility] on an inpatient or outpatient basis." *Id*. § 229.13(1)(b).

When the court orders outpatient treatment, "the outpatient treatment provider must be notified and agree to provide the treatment prior to placement of the respondent under the treatment provider's care." *Id*. § 229.13(3). The court must furnish the provider's chief medical officer with a written order that (1) sets forth the evidence on which the finding of serious mental impairment is based and (2) "require[s] the respondent to cooperate with the treatment provider and comply with the course of treatment." *Id*. § 229.13(4). Within fifteen days of the respondent's commitment, the chief medical officer must "mak[e] a recommendation for the disposition of the matter." *Id*. § 229.13(5). The chief medical officer must recommend one of four alternatives:

> (1) release from hospitalization and termination of the proceedings if the committed person "does not . . . require further treatment for serious mental impairment;" (2) full-time care and treatment if the person is "seriously mentally impaired;" (3) treatment as an outpatient or on another "appropriate basis," if the person is "seriously mentally impaired" and in need of treatment but not full-time hospitalization; and (4) alternative placement, if the person is

13

> "seriously mentally impaired" and in need of full-time custody and care, "but is unlikely to benefit from further treatment in a hospital."

*B.A.A. v. Chief Med. Officer, Univ. of Iowa Hosps.*, 421 N.W.2d 118, 125 n.4 (Iowa 1988) (quoting Iowa Code § 229.14); *accord Lappe v. Loeffelholz*, 815 F.2d 1173, 1178 (8th Cir. 1987) (similar). So long as the respondent remains committed, the chief medical officer must continue to make similar reports at successive intervals. *B.A.A.*, 421 N.W.2d at 125 n.4 (citing Iowa Code §§ 229.14 and 229.15).

If the respondent refuses outpatient treatment, the court may order inpatient treatment. Iowa Code § 229.15(2); *see Lappe*, 815 F.2d at 1179 n.5 (stating that, when an inmate refuses outpatient treatment and fails to show good cause, "the court should [order] him to full inpatient status"). When the chief medical officer believes that the respondent "no longer requires treatment or care for serious medical impairment," the court must order the respondent discharged and terminate all commitment proceedings against him. Iowa Code § 229.16.

The foregoing statutory scheme demonstrates that a person who is ordered to undergo outpatient treatment in Iowa is clearly committed to a mental institution, as contemplated in 18 U.S.C. § 922(g)(4). A formal order of commitment is a prerequisite to outpatient treatment, outpatient treatment continues only while the respondent is under such an order and the treatment does not end absent a court order terminating the commitment. *Cf. Dorsch*, 363 F.3d at 786-87 (holding that a defendant was committed to a mental institution and seizing upon the fact that he was committed pursuant to statutory procedures).

The referee's orders and the Chief Medical Officer's actions complied with the statutory scheme, and they reinforce the inescapable conclusion that B.H. was committed

to the Center. On September 4, 2002, the referee explicitly ordered B.H. "immediately *committed* as an out-patient *to* the . . . Center for a complete evaluation and appropriate treatment [and to] . . . . be medicated by injections prior to discharge from the hospital." (Emphasis added.). *Cf. Whiton*, 48 F.3d at 358 (seizing upon judge's use of the term "committed" to find that a defendant had been "committed to a mental institution"). B.H. remained committed to the Center, under the supervision of the Chief Medical Officer, for the next seven months. The Chief Medical Officer was responsible for B.H. and was required to periodically report to the referee on B.H's status. If B.H. refused such outpatient treatment, he was subject to an order to undergo inpatient treatment. B.H.'s commitment to the Center ended on April 10, 2003, when the referee ordered that the "out-patient *commitment* previously ordered herein shall immediately terminate and [B.H.] is hereby discharged." (Emphasis added.).

In sum, the court holds that B.H. was "committed to a mental institution" from September of 2002 through April of 2003. 18 U.S.C. § 922(g)(4); *Dorsch*, 363 F.3d at 785; 27 C.F.R. § 478.11. The referee's decision to commit B.H. to the Center on an outpatient basis, as opposed to on an inpatient basis, merely recognized the "customary procedure" in Iowa to treat persons with serious mental impairments "in the least restrictive environment medically possible." *Leonard v. State*, 491 N.W.2d 508, 512 (Iowa 1992) (citing, in part, Iowa Admin. Code r. 441—28.4(6) ("The patient shall have the right to the least restrictive conditions necessary to achieve the purposes of treatment.")). It did not alter the fundamental fact that B.H. was committed to the Center. *See, e.g., Lappe*, 815 F.2d at 1179 (characterizing a person in similar circumstances as on "outpatient involuntary commitment status"); *C.R. v. Adams*, 649 F.2d 625, 627 (8th Cir. 1981) (discussing the Iowa involuntary commitment scheme and stating that, "[d]uring these periods of outpatient treatment, C.R. was still considered committed, and will remain

so until his involuntary commitment is terminated by court order"); *cf. id.* at 627-28 (drawing comparison between "a mental patient who has been granted outpatient status" and a parolee); *State v. Knipe*, 349 N.W.2d 770, 772 (Iowa 1984) (holding that an inmate on furlough was "committed" to an institution even though he was not physically confined there, because the inmate was still subject to the rules and regulations of the institution). *See generally* Ingo Keilitz & Terry Hall, *State Statutes Governing Involuntary Outpatient Civil Commitment*, 9 Mental & Phys. Disab. L. Rep. 378 (1985).[15]

Accordingly, the court holds that B.H. was "committed to a mental health institution" in September of 2002. 18 U.S.C. § 922(g)(4).

### 3. Conclusion

Because B.H. was committed to a mental health institution in September of 2002, he is a prohibited person. *Id.*

### B. Third-Party Sale

Because B.H. is a prohibited person, the court shall order the government to destroy the firearms and ammunition in its possession. *See B.H.*, 456 F.3d at 818 n.4 ("[P]reventing excluded persons under section 922(g)(4) from reacquiring guns and ammunition is a legitimate enforcement of that statute." (Citations omitted.)). The court shall deny B.H.'s request to order the government to hand the firearms and ammunition over to a third party, with the proceeds to be remitted to B.H. The Eighth Circuit Court of Appeals has held that such a request is "frivolous," because "to allow [the prohibited person] to reap the economic benefit from ownership of the weapons which it is illegal for

---

[15] Although clearly not meant as a decision on the merits, the court notes that the Eighth Circuit Court of Appeals paraphrased the referee's September 4, 2002 decision as "order[ing] that B.H. be immediately *committed* as an outpatient *to* [the Center] for evaluation and treatment." *B.H.*, 456 F.3d at 815 (emphasis added).

him to possess would make a mockery of the law." *United States v. Bagley*, 899 F.2d 707, 708 (8th Cir. 1990); *see United States v. Howell*, 425 F.3d 971, 976 n.4 (11th Cir. 2005) (holding that "[r]equiring a court to return firearms to a convicted felon would not only be in violation of a federal law, but would be contrary to the public policy behind the law," and "[o]bviously, the courts cannot participate in a criminal offense by returning firearms to a convicted felon"); *see B.H.*, 456 F.3d at 818 n.4 (approving of *Howell*).

## VI. MOTION TO DISMISS

As a final matter, B.H. asks the court to dismiss the Complaint, because the federal agents allegedly unlawfully seized the firearms and ammunition from the Black Hawk County Sheriff's Office. In support of his request, B.H. points to Federal Rule of Criminal Procedure 41, which provides that "[a] person aggrieved by an unlawful search and seizure of property . . . may move for the property's return" in a criminal case. Fed. R. Crim. P. 41(g).

Assuming without deciding that a Rule 41(g) motion is a procedurally appropriate vehicle for relief in this civil proceeding,[16] the court shall deny B.H.'s request. The court may not grant a Rule 41(g) motion if the movant is not lawfully entitled to possess the seized property. *Felici*, 208 F.3d at 670; *see United States v. Rearick*, 181 Fed. Appx. 303, 304-05 (3d Cir. 2006) (affirming district court's decision to deny Rule 41(g) motion,

---

[16] B.H.'s request appears to be procedurally defective. Because this is a civil proceeding, the rules of criminal procedure would appear to not apply. *See* Fed. R. Crim. P. 1(a)(1) ("These rules govern the procedure in all criminal proceedings in the United States district courts . . . ."); *cf.* Fed. R. Crim. P. 1(a)(5) ("Proceedings not governed by these rules include . . . a civil property forfeiture for violating a federal statute."). The court also notes that B.H. should have filed the motion to dismiss separately. *See* LR 7.1(e) ("A resistance to a motion may not include a separate motion or a cross-motion by the responding party. Any separate motion or cross-motion must be filed separately as a new motion.")

17

because the movant was a prohibited person).

## VII. CONCLUSION

The government's Motion (docket no. 41) is **GRANTED**. The court **DECLARES** that the government may destroy B.H.'s firearms, ammunition and related items.

**IT IS SO ORDERED.**

**DATED** this 7th day of December, 2006.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

# REDACTED INVENTORY

<u>INVENTORY OF STREET, WATERLOO, IOWA</u>
<u>PROPERTY SEIZED FROM</u>
**13:29 HOURS**

FILED
'23 MAR 3 at 26
CLERK OF DISTRICT COURT
BLACK HAWK COUNTY, IOWA

S02-7654Y

## GARAGE:
(2) Green boxes of 100 rounds of 44 mag. shells
(2) Green boxes of 41 magnum shell cases, 5 rounds
Red plastic box with 100 rounds of 357
Red plastic box with 100 rounds of 9mm.
Plastic butter tub of assorted rounds and sizes of live ammunition
Red plastic box of 100 rounds of 38 ammunition
20 rounds of 30.06
Small red plastic box of 45 cal. ammunition
(2) Remington tin with 22 long rifle ammunition, 475 rounds
Federal box of 500 rounds of 22 ammunition
Plastic sleeve 20 rounds of 30.06 ammunition
(4) small peanut butter jars full of ammunition
(4) plastic bags of assorted calibers of ammunition
(9) containers of 22 ammunition
(1) peanut butter jar full of 22 ammunition
Plastic sack with 3 boxes of 22 ammunition

## RED FORD VAN LICENSE 934FHT:
(2) peanut butters jars full of 22 ammunition
(2) large boxes of 550 rounds of 22 ammunition
Approximately 10 boxes of 50 rounds of 22 ammunition
(3) green plastic boxes containing assorted large caliber ammunition 100 rounds per container
(1) green plastic box with 100 rounds of 30.06 ammunition

## TAN CHEVROLET:
(2) boxes of 550 rounds of 22 ammunition
(1) mason jar of 22 ammunition
(1) box of 50 rounds of 22 ammunition and 100 round box of ammunition
50 boxes of 550 rounds/box of 22 ammunition
Plastic juice container full of 22 ammunition
(1) plastic milk jug full of 22 ammunition
(2) 50 round plastic containers of 45 cal. ammunition
(1) plastic bag of 22 ammunition with approximately 500 rounds
(9) boxes 555 count each of 22 ammunition plus approx. 10 rounds of 44 cal. ammunition
Continuous feeding belt of 30.06 ammunition
(13) boxes of 45 cal. ammunition
(2) wood boxes full of 44 and 45 cal. ammunition
(1) cardboard box full of 44 ammunition
(1) white plastic sack full of 30.06 rounds
(1) Aldi sack with 6 boxes of wild cat ammunition 500 rounds/box
Cardboard box full of 44 ammunition
Black plastic box with .41 magnum ammunition
(4) Tan boxes of .41 cal. ammunition 100 rounds/box
Cardboard box full of 30.06;44 cal., 22 cal ammunitions
(8) 8 lb. cans of smokeless powder
(4) cardboard 8 lb. containers of powder
(13) containers of 1-lb. powder
(1) 4-lb. container of powder

# REDACTED INVENTORY

(21) 1-lb. containers of powder
(3) green plastic containers of 30.06 ammunition 100 rounds/each
Plastic bucket full of 44 and 45 ammunition 41 cal. ammunition
(1) clothes basket full of assorted rounds of ammunition ranging from 30.06 to .45 cal. to 22 rounds most of it is all large caliber some .458 rounds
(3) boxes of 500 rounds Winchester wild cat .22 ammunition
(1) Menuarm 4.5 cal. 177 pellet pistol no serial number in a black plastic case
(1) Smith Wesson 41 magnum revolver stainless
(1) Wolverine boot box containing 4 boxes of 500 rounds of 22 ammunition; 2 boxes of .45 cal. 50 rounds each ammunition; box of 22 short ammunition 500 rounds
(2) plastic containers of 45 cal.
(4) smaller boxes of 22 cal. ammunition
JC Higgins 22 cal. pistol no serial number
(1) Erma/Excam model RX22 – 22cal. pistol Serial J18879
(1) 22 cal. Erma/Excam pistol Serial J18854
(1) Winchester Ranger 30.06 rifle with 6 by 40 scope Tasco brand. Serial Number on the gun G1664522
(1) Marlon rifle 22 cal. Serial number 14505972
(1) Marlon 22 lever action rifle model original golden 39AS serial number 04110050
An assortment of blow gun ammunition
.458 Interarms rifle with a tasco scope serial number B75155 that is bolt-action
(1) KBI AK-47 22 cal. rifle serial number A729969
(1) Marlon 22 cal rifle semi-automatic serial 13322851
Marlon 22 rifle lever action original golden-39AS serial 03120491
(1) Stevens barrel 22 cal. long barrel rifle bolt action with a high country scope. No serial number
(1) Smith-Wesson chrome 357 magnum revolver no serial number available at this time
(1) Colt MKIV Series 80 .45 cal. semi-automatic pistol. Serial FG50844. In a brown vinyl case with 3 ammunition clips and ammunition
(1) Smith-Wesson 44 mag. Stainless revolver with no serial number in a blue box.
(1) Grey clothed zipper bag containing several rounds of 22 ammunition also containing a Barretta 25 cal. pistol with serial number BT10960V
(1) Ruggar 22 cal. long rifle pistol model Mark 1 serial 10-14282
(1) Ruggar 22 cal. long rifle Mark 1 semi-automatic pistol serial 13-85367
Grey fabric case containing:
(1) Smith-Wesson 44 magnum chrome revolver no serial number.
(1) .41 magnum stainless revolver Smith Wesson brand serial BBAS905 Model 657.
(5) green plastic boxes of 30.06 rounds 100 rounds/box
(3) boxes of 100 rounds apiece .41 cal. ammunition
(1) wood box full of 30.06 ammunition
(10) 1-lb. containers of IMR4895 smokeless powder
(1) 8-lb. container of smokeless powder in a cardboard box
(3) 1-lb. containers of smokeless powder
(4) boxes of 30.06 ammunition
Tin can of assorted ammunition
Cardboard box with 30.06 and 45 cal. ammunition

**FILED**
AUG 28 [illegible]
CLERK OF DISTRICT COURT
BLACK HAWK COUNTY, IOWA